UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2021
(Argued:  August 18, 2021      Decided:  January 21, 2022)

---

Docket No. 19-4107-cv

---

DANIEL TRIOLO,

*Plaintiff-Appellant*,

*v.*

NASSAU COUNTY, DETECTIVE RICHARD C. LEE,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

Before:      POOLER, CHIN, and LOHIER, *Circuit Judges*.

---

Appeal from an order of the United States District Court for the

Eastern District of New York (Tomlinson, *M.J.*), denying in part and granting in

part defendants-appellees' renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). The district court vacated a jury verdict in favor of plaintiff-appellant and dismissed his false arrest claims against a Nassau County detective and Nassau County under 42 U.S.C. § 1983 and New York state law. The district court upheld the jury's finding that the detective lacked probable cause to arrest plaintiff-appellant, but concluded that the detective was protected by qualified immunity. The court then dismissed the claims against Nassau County based on the detective's qualified immunity.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

JUDGE LOHIER CONCURS, in a separate opinion.

---

ANISH PATEL, Law Student, and JON ROMBERG (Mikayla R. Berliner, Christopher A. Dernbach, Kamille E. Perry, *and* Lauren E. Russo, Law Students, *on the brief*), Seton Hall University School of Law, Center for Social Justice, Newark, New Jersey, *for Plaintiff-Appellant*.

JACKIE L. GROSS, Nassau County Attorney (Robert F. Van der Waag, Deputy County Attorney *and* Samuel Weinstein, Law Student Intern, *on the brief*), Mineola, New York, *for Defendants-Appellees*.

---

CHIN, *Circuit Judge*:

On May 18, 2015, plaintiff-appellant Daniel Triolo ("Triolo") was arrested for an altercation involving members of his immediate family that occurred the day before. Defendant-appellee Richard C. Lee ("Lee"), a detective with the Nassau County Police Department, arrested Triolo without a warrant based on a domestic incident report signed by Triolo's brother and mother. Triolo spent one night in jail and the charges against him were eventually dismissed.

On April 27, 2016, Triolo sued Lee for false arrest under 42 U.S.C. § 1983 and New York state law and defendant-appellee Nassau County (the "County"), Lee's employer, under a theory of *respondeat superior*. In December 2018, after a four-day trial, the jury returned a verdict in favor of Triolo, finding that Lee did not have probable cause to arrest Triolo and awarding compensatory and punitive damages.

The district court vacated the jury's verdict and dismissed the claims against both defendants on the ground that, although the evidence supported the jury's finding that Lee did not have actual probable cause, Lee was entitled to qualified immunity because he had arguable probable cause as a matter of law.

The district court also dismissed the claims against the County based on Lee's

immunity.  This appeal followed.

We AFFIRM in part, REVERSE in part, and REMAND.

## BACKGROUND

"Because this appeal follows a jury verdict, we view the facts in the

light most favorable to the prevailing party."  *MacDermid Printing Solutions LLC v.*

*Cortron Corp.*, 833 F.3d 172, 178 n.1 (2d Cir. 2016) (reviewing denial of judgment

as a matter of law).  Here, while the parties disagree as to many of the facts, we

view the facts in the light most favorable to Triolo.  *Id.*

### I.    The Facts

#### A.    The First Altercation

On May 15, 2015, Triolo's father passed away suddenly.  Two days

later, on May 17, 2015, around 2:10 p.m., Triolo arrived at his mother's house to

check on her.  He was accompanied by his wife, Debra.  An altercation ensued

between Triolo and his brother, Stephen, and their mother, Patricia.

The house smelled of marijuana.  Triolo found Stephen inside and

told him he should not be smoking marijuana in the house.  In response, Stephen

jumped up from his chair and started yelling and threatening Triolo.  Both Triolo

4

and Debra believed Stephen was under the influence of crack cocaine.  Triolo

yelled back at Stephen, but at no point did he grab, punch, or otherwise touch his

brother.  Nor did he yell at, threaten, grab, or push his mother.[1]  Debra believed

Patricia was under the influence of alcohol or drugs, possibly Xanax given to her

by her other son, Michael.

Patricia called 911 at 2:14 p.m.  The 911 call report stated:  "Female

now on the line states her two sons are fighting" and "mom wants older son

arrested.  He threatened her."  J. App'x at 92.  The report did not state that

anyone was harmed.

Three police officers arrived at Patricia's house in response to the

call.  By then, Triolo had left.  Both Stephen and Patricia gave sworn statements

to the officers.  According to the police report, however, neither had visible

injuries.

Stephen's statement read:

> My mother invited my brother, Daniel, Triolo, to the house to
> play with the dog.  Daniel entered the house, screaming
> where is he?  I'm going to kill him.  Out of my way.  My

---

[1]      According to Stephen, Triolo entered the house, grabbed his neck, and began
punching him.  He maintains that he was sober that day.  Patricia claimed that Triolo
grabbed her wrist in an attempt to take her phone away to prevent her from calling 911.
Triolo denies touching his mother.  Because Triolo prevailed at trial, we accept his
version of events.

mother attempted to stop my brother Daniel from attacking
me. Daniel grabbed my mother by her wrist and pushed her
out of the way. Daniel then jumped on top of me while I was
sitting on the chair watching TV and began to choke me with
his both hands [*sic*]. I lost ability [*sic*] to breathe and saw stars.
My brother Daniel again started to punch me by my face with
his fist and spitting at me at the same time. I feel pain in my
head area and pain on my left side body. I request an arrest.
Daniel in the house stated to mother Patricia, I'm going to
fucking kill you and I hate you fucking guts [*sic*]. I'm going to
kill your son. Patricia is in fear for her safety and requested
an arrest as well.

J. App'x at 70-71. Patricia's statement read:

My son Daniel entered my house, started to scream at me. I'm
going to fucking kill you, and I hate your fucking guts. I'm
going to kill your son. I attempted to stop my son from
hurting Stephen. Daniel grabbed me by my wrist and pushed
me out of the way. My wrists are hurting. I'm in a lot of pain.
I request an arrest. I'm in fear for my safety.

J. App'x at 72. The domestic incident report noted that there were "no visible

injuries" and that no arrest was made because "no offense [was] committed." J.

App'x at 169, 173-77.[2] It also noted, however, that Triolo engaged in "punching,

pushing, strangulation, and . . . choking." *Id.* at 174. After taking the statements

and filling out the domestic incident report, the officers left the scene. At the

precinct, a supervisor completed the domestic incident report and forwarded the

---

[2] The officer who completed the report testified that he marked "no offense
committed" by mistake.

case, including the domestic incident report and sworn statements, to Lee.  When Lee received the case, he reviewed the domestic incident report and the sworn statements.[3]

### B.    *The Second Altercation*

Triolo's father's wake was held on May 18, 2015, at 2:00 p.m.  Shortly after Triolo and Debra arrived at the wake, a second altercation began.  While Triolo sat in the front row of the funeral home room, Stephen and Michael approached and physically attacked him.  Triolo and Debra left the wake shortly after the altercation.

### C.    *The Arrest*

Triolo and Debra returned home around 3:00 p.m.  Debra then called police officers at Nassau County's eighth precinct to report the assault on her husband at the funeral home.  Three or four officers arrived at the house in response to her call.

While Debra was speaking with the responding officers, Lee and another officer arrived at the house in plainclothes and an unmarked vehicle.

---

[3]    Lee testified that he called Stephen and Patricia the next day to confirm their statements.  There is no evidence of these calls, however, and Triolo disputes that they occurred.

7

Lee approached the group, asked for Triolo, and immediately began to place him

under arrest.  Debra and Triolo were shocked, and Debra began to explain that

Triolo was in fact the victim of an assault, not the aggressor.  Lee responded that

he was interested only in what happened the day before.  Although Debra

responded that she was with Triolo the day before and that he did not do

anything, Lee rolled his eyes and appeared disinterested in what she had to say.

He asked no questions.  Lee handcuffed Triolo and walked him towards the

unmarked car.

At Debra's urging, officers from the eighth precinct then asked Lee

to exit the car to speak with her.  He did.  In response to Debra's questions, Lee

said that he did not know what Triolo was being charged with and that Debra

would have to call the precinct to find out.  Debra again expressed shock and

explained that she was in the process of reporting an assault *on* her husband

when Lee arrived.  According to Debra, Lee responded that he "would never take

that report because that's retaliation and that's tit-for-tat" and that anything she

had to say "doesn't matter."  J. App'x 64.  Debra again explained that she was

present during the assault the day before and had taken pictures the next

morning that showed that Triolo's dominant hand and other parts of his body

had no marks on them -- proof that he had not assaulted anyone.[4]  Instead of

asking follow up questions, Lee simply rolled his eyes again and walked away.

The conversation lasted only a few minutes.  Triolo was arrested around 3:40

p.m.[5]

> ### D.      The Release and Dismissal

Triolo was charged with:  (1) criminal obstruction of breathing or

blood circulation, in violation of New York Penal Law § 121.11, for choking

Stephen; and (2) assault in the third degree under § 120.00, for grabbing his

mother.  He spent time in a precinct holding cell where he was handcuffed to a

wall.  He was then transported to Nassau University Medical Center to receive

treatment for the shoulder injury he sustained during the altercation at the

funeral home.  After being held in a different location until the next morning, he

was transported to criminal court and eventually released on bail.  The criminal

charges against Triolo were dismissed shortly thereafter.

---

[4]      After Michael left Debra voice messages claiming that Triolo had been violent the previous day and indicating that the police were looking for him, Debra took pictures to disprove the false allegations.

[5]      According to Lee, he had waited until the day after the alleged assault to arrest Triolo because he believed that would allow Triolo to attend his father's funeral.  In fact, the funeral was on May 19, 2015, and Triolo was not able to attend because he was in custody.

## II.    *The Proceedings Below*

On April 27, 2016, Triolo commenced this action against Lee and the County seeking damages for false arrest under federal and New York state law. Trial began on December 3, 2018. Before the case was submitted to the jury, Lee and the County moved for judgment as a matter of law. The district court denied the motion.

On December 7, 2018, the jury returned a verdict in favor of Triolo on both the federal and state claims, finding that Lee did not have probable cause to arrest. The jury awarded Triolo "$150,000 in compensatory damages [against] the Defendants" and "$35,000 in punitive damages [against] Detective Lee." J. App'x at 180-81.

Lee and the County thereafter renewed their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). On November 4, 2019, the district court denied the motion in part and granted it in part. The court upheld the jury's finding that there was no probable cause but dismissed the claims against both defendants based on qualified immunity. The court held that, although "Lee did not have actual probable cause as a matter of law to arrest [Triolo] for criminal obstruction of breathing or third-degree assault, the

10

record is clear enough for the Court to determine that Lee had *arguable* probable cause to arrest [Triolo] for these crimes."  J. App'x at 23.

As to probable cause, the court explained that the jury's verdict was supported by evidence sufficient to raise doubts about Stephen's and Patricia's truthfulness, including lack of any physical injury and their alleged intoxication, as well as the domestic incident report, which indicated that no offense had been committed.  As to qualified immunity, the court explained that the evidence did not cast so much doubt on the truthfulness of the statements that "no reasonable officer could have determined that probable cause existed to arrest [Triolo] for criminal obstruction of breathing or third-degree assault."  J. App'x at 195-96 (internal quotation marks omitted).  Thus, the court concluded that there was arguable probable cause to arrest Triolo and therefore Lee was entitled to qualified immunity.  The court also dismissed the claims against the County, reasoning that the County was not liable because Lee was immune from liability and it was sued for Lee's conduct only under a theory of *respondeat superior*.  This appeal followed.[6]

---

[6]     On December 7, 2020, this Court appointed pro bono counsel for Triolo, directing counsel to brief "whether the jury award of punitive damages in this case is inconsistent with the district court's finding of arguable probable cause, and, if so, [whether] such

### STANDARD OF REVIEW

We review *de novo* a district court's decision on a motion for

judgment as a matter of law under Federal Rule of Civil Procedure 50(b),

"considering the evidence in the light most favorable to the non-moving party

and giving that party the benefit of all reasonable inferences that the jury might

have drawn in that party's favor from the evidence." *Cangemi v. United States*, 13

F.4th 115, 135 (2d Cir. 2021) (cleaned up).  In other words, we apply "the same

standard that is required of the district court." *Smalls v. Collins*, 10 F.4th 117, 131

(2d Cir. 2021) (internal quotation marks omitted).

A district court may grant judgment as a matter of law only if it

finds that "a reasonable jury would not have a legally sufficient evidentiary basis

to find for the [nonmoving] party."  Fed. R. Civ. P. 50(a)(1); *see also Cangemi*, 13

F.4th at 136.  We affirm the denial of a Rule 50(b) motion "unless there is such a

complete absence of evidence supporting the verdict that the jury's findings

could only have been the result of sheer surmise and conjecture, or the evidence

in favor of the movant is so overwhelming that reasonable and fair minded

persons could not arrive at a verdict against it." *Ashley v. City of New York*, 992

---

inconsistency invalidates the district court's finding, and any other issues counsel
deems necessary."  J. App'x at 203.

12

F.3d 128, 138-39 (2d Cir. 2021) (cleaned up).  The movant's burden is "particularly

heavy" where, as here, the "jury has deliberated in the case and actually returned

its verdict." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).

## *DISCUSSION*

On appeal, Triolo argues that the district court erred in vacating the

jury's verdict and dismissing his false arrest claims against both Lee and the

County.  We hold that the district court properly dismissed the claims against

Lee but erred in dismissing the claims against the County.  First, the jury's

finding that Lee did not have probable cause was supported by the evidence.

Second, Lee is nevertheless entitled to qualified immunity because he had

arguable probable cause as a matter of law.  Third, the County is vicariously

liable for the compensatory damages against Lee under New York state law.

### I.   *Probable Cause*

The district court found that the record supported the jury's finding

that Lee lacked probable cause to arrest Triolo.  We agree.

Under both federal and New York state law, probable cause is a

complete defense to a false arrest claim.  *See, e.g.*, *Figueroa v. Mazza*, 825 F.3d 89,

99 (2d Cir. 2016) ("The existence of probable cause to arrest -- even for a crime

other than the one identified by the arresting officer -- will defeat a claim of false

arrest under the Fourth Amendment."); *De Lourdes Torres v. Jones*, 26 N.Y.3d 742,

759 (2016) ("For purposes of the privilege element of a false arrest and

imprisonment claim, an act of confinement is privileged if it stems from a lawful

arrest supported by probable cause.").

To determine whether probable cause existed, we consider the

totality of the circumstances, *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir.

2007), reviewing "plainly exculpatory evidence alongside inculpatory evidence to

ensure the court has a full sense of the evidence that led the officer to believe that

there was probable cause to make an arrest," *Stansbury v. Wertman*, 721 F.3d 84,

93 (2d Cir. 2013) (internal quotation marks omitted).  In this analysis, we

"consider those facts available to the officer at the time of the arrest and

immediately before it," keeping in mind that "an officer may not disregard

plainly exculpatory evidence." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012)

(internal quotation marks omitted).  "The significance of each of these factors

may be enhanced or diminished by surrounding circumstances." *Jenkins*, 478

F.3d at 90.

Law enforcement officers have probable cause to arrest "when they have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (internal quotation marks omitted); *see also De Lourdes Torres*, 26 N.Y.3d at 759 ("Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty."). More specifically, "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the [alleged] victim's veracity." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). The "veracity of the informant and the basis for the informant's knowledge are two important factors." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation marks omitted).

Here, although Stephen and Patricia signed sworn statements attesting to the alleged assault, the jury reasonably found that Lee disregarded evidence that undermined their veracity. Neither Stephen nor Patricia had

15

visible injuries after allegedly being grabbed, choked, or punched. No arrest was made on the day of the alleged assault, and the domestic incident report also indicated that "no offense [was] committed." Immediately before the arrest, Debra repeatedly told Lee that Triolo was the victim, not the aggressor, in the domestic dispute. In fact, she was already in the process of reporting Stephen's assault on her husband at the funeral home to police officers from her local precinct when Lee arrived at her home. She tried to show Lee photographic evidence in support of her claims to no avail. Lee showed no interest in Debra's photographs or her version of events, and he repeatedly rolled his eyes as she spoke. He did not ask any follow-up questions. Lee instead dismissed Debra's efforts, handcuffed Triolo, and left the scene.

Faced with information that undermined the veracity of the alleged victims, Lee did not engage in further investigation to ensure the existence of probable cause. And although he had no duty to seek it out, Lee was not free to disregard the plainly exculpatory evidence that was presented to him. *See Fabrikant*, 691 F.3d at 214. Viewing the facts in the light most favorable to Triolo, we conclude that the trial evidence was sufficient for a reasonable jury to find that "a person of reasonable caution" in Lee's position would have understood

16

that he did not have reasonably trustworthy information to believe that Triolo committed a crime. *See Hernandez*, 939 F.3d at 199 (internal quotation marks omitted). In other words, we do not find "such a complete absence of evidence" supporting the jury's verdict that would require reversing the district court's denial of the Rule 50(b) motion. *See Ashley*, 992 F.3d at 138-39 (internal quotation marks omitted). Accordingly, we conclude that the district court properly upheld the jury's finding as to the absence of actual probable cause.

## II.   *Qualified Immunity*

Triolo argues that the district court improperly held that Lee was entitled to qualified immunity because the jury's award of punitive damages "necessarily precludes immunity under both federal and New York law." Appellant's Suppl. Br. at 28 n.5. We disagree. First, Lee is immune under federal law because he had arguable probable cause. Second, Lee is immune under New York state law because his actions were discretionary and not objectively unreasonable, and the record, even construed in Triolo's favor, does not establish bad faith.

17

### A.    Federal Law

Even where actual probable cause does not exist, an officer may be entitled to qualified immunity on a § 1983 false arrest claim if his actions were objectively reasonable or if "arguable probable cause" existed at the time of the arrest. *Figueroa*, 825 F.3d at 100; *accord District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) ("Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they reasonably but mistakenly concluded that probable cause was present." (cleaned up)).  A defendant has the burden of proving the affirmative defense of qualified immunity. *See Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980).

"A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa*, 825 F.3d at 100 (internal quotation marks omitted).  The question is "not whether the officer *should have* acted as he did." *Id.*  Instead, it is "whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that" probable cause existed. *Id.*  Indeed, as the Supreme Court has repeatedly recognized, "qualified

immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abassi*, 137 S. Ct 1843, 1867 (2017) (internal quotation marks omitted). Whether a particular officer falls into either of these categories turns on "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar*, 137 S. Ct. at 1867 (internal quotation marks omitted).

Although we have concluded that the jury reasonably found a lack of actual probable cause, we agree with the district court that Lee nonetheless had arguable probable cause to arrest Triolo.[7] As explained above, Lee lacked actual probable cause because he ignored exculpatory evidence and information that undermined the veracity of the alleged victims. But that conclusion does not preclude a finding of arguable probable cause. On this record, even construed in the light most favorable to Triolo, it is not clear that *no* reasonable officer could have believed that probable cause existed. *See Figueroa*, 825 F.3d at 100.

---

[7] This Court has explained that "the distinction between reasonableness as a component of a Fourth Amendment violation and reasonableness as a component of an immunity defense" results in a situation where "an officer is protected in some circumstances even when he mistakenly concludes that probable cause is present when he reasonably believes that a reasonably prudent police officer would have acted even though a reasonably prudent police officer would not have acted." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) (cleaned up).

19

The alleged victims signed a domestic incident report, alleging that Triolo choked, punched, grabbed, and injured them. Their accounts were consistent with each other's. And even though the lack of visible injuries arguably undermined their veracity, it is nonetheless possible that no visible injuries resulted from the alleged assault. Finally, although the report stated that no arrest was made on May 17, 2015, because "no offense [was] committed," a reasonable officer receiving this report could have concluded this was a mistake because the form also plainly indicated that Triolo had engaged in punching, pushing, strangulation, and choking.

Accordingly, although we do not conclude that the evidence in favor of defendants is "so overwhelming that reasonable and fair minded persons could not arrive at a verdict against" them to justify vacating the jury's finding of lack of actual probable cause, *Ashley*, 992 F.3d at 139 (cleaned up), we nonetheless conclude that Lee had arguable probable cause based on the domestic incident report and accompanying statements. Lee's actions, though wrong, were not so wrong that *no* reasonable officer, "out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged

20

action was lawful." *See Figueroa*, 825 F.3d at 100. As a result, Lee is entitled to

qualified immunity with respect to the § 1983 claim.

**B.** *New York State Law*

New York law grants government officials qualified immunity on

state law claims, including false arrest claims, if their actions entail "making

decisions of a judicial nature," unless "there is bad faith or the action taken is

without a reasonable basis." *Arteaga v. State of New York*, 72 N.Y.2d 212, 216

(1988). In other words, New York immunity law requires both objective and

subjective reasonableness. *See Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir.

2012) ("In contrast to the federal standard, which is objectively reasonable

reliance on existing law, the New York standard for entitlement to qualified

immunity has both objective and subjective components." (internal citations and

quotation marks omitted)).

As to the first prong, a decision is "of a judicial nature" if it "requires

the application of governing rules to particular facts," or if it is "an exercise of

reasoned judgment which could typically produce different acceptable results."

*Arteaga*, 72 N.Y.2d at 216-17 (cleaned up). Here, Lee's decision to arrest Triolo

based on what he believed to be probable cause required the application of

21

governing rules to facts.  As explained above, that decision was not objectively

unreasonable and could have produced different acceptable results.

Accordingly, he satisfies the objective component.

As to the second prong, an officer cannot satisfy the subjective

component "if there are undisturbed findings of bad faith" in the record.  *Lore*,

670 F.3d at 166 (internal quotation marks omitted).  Triolo argues that the jury's

award of punitive damages constitutes a finding of bad faith, which was not

disturbed by the district court.  We disagree.  First, the jury's punitive damages

award was, in fact, disturbed; it was vacated by the district court.  Second, even

though the jury awarded punitive damages, it did not necessarily find malice;

the jury instruction allowed punitive damages for behavior done "wantonly" or

"oppressively" as well.  *See* J. App'x at 153.  Third, even if the jury's award

implied a finding of malice, the record does not support that finding.

The jury awarded $35,000 in punitive damages after it was

instructed it could award punitive damages if it found Lee had made the arrest

maliciously ("prompted or accompanied by ill-will or spite or grudge either

toward the plaintiff individually or toward all persons in the group or category

of which the injured person is a member"), wantonly ("in reckless or callous

22

disregard of, or indifference to the rights of the injured person"), *or* oppressively ("in a way or manner which injuries or damages or otherwise violates the rights of another person with unnecessary harshness or severity or by misuse or abuse of authority or power"). *See* J. App'x at 153. The jury did not specify which of these three alternatives described Lee's conduct. Even assuming the jury found that Lee acted maliciously, we agree with defendants that "there is not a scintilla of evidence that the detective actually had any malicious" intent. Appellees' Suppl. Br. at 22-23.

The jury's award of punitive damages does indicate that it assessed the trial testimony and evidence to strongly favor Triolo. That said, there is no evidence in the record that Lee held any ill-will, spite, or other bad faith toward Triolo. Indeed, Lee had a domestic incident report, signed by two victims, which noted that Triolo had engaged in punching, pushing, strangulation, and choking. The only fact Triolo points to as showing bad faith is that Lee was not interested in hearing Debra's version of events while he was arresting Triolo. This alone is insufficient to support a finding of malice. Viewed in a light most favorable to Triolo, the record could only support a finding of callousness or indifference in making the arrest, and such a finding does not preclude the legal conclusion that

23

Lee acted in subjective good faith. Accordingly, Lee satisfies both prongs of the New York immunity test and is immune from Triolo's state law false arrest claim.

## III.   *Vicarious Liability*

Next, Triolo argues that, even if Lee is entitled to qualified immunity, the County is still vicariously liable for Lee's wrongful conduct under New York law.[8] Specifically, Triolo argues, "when an employee-officer commits an underlying violation, such as false arrest without probable cause, but is personally shielded by qualified immunity, the municipal employer, like any other principal under New York law, remains vicariously liable for its agent's conduct." Appellant's Suppl. Reply at 26-27. We agree. First, qualified immunity is an individual affirmative defense that does not protect municipalities. Second, under New York law and basic agency principles, a municipal employer is vicariously liable for the wrongs of its employee, even

---

[8]     Defendants argue that the County cannot be held vicariously liable for the claims against Lee under either federal or state law. Triolo, however, does not argue the County is vicariously liable under federal law. In any event, it is well established that under federal law, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). The issue here is whether a municipal employer can be held vicariously liable for its employee's wrongs under New York law.

24

when the employee is individually immune, so long as the wrong was committed within the scope of employment.

### A. *Municipal Immunity*

The County is not entitled to qualified immunity, and, despite defendants' contentions otherwise, Lee's immunity does not somehow transfer to his municipal employer.  The Supreme Court has explicitly rejected the idea that municipalities are entitled to qualified immunity under federal law.  *See Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166–67 (1993) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983.").  Further, the justifications behind qualified immunity simply do not apply to municipalities. As the Supreme Court has explained, "the concern that the threat of *personal* monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process" is "[a]t the heart" of the justification for qualified immunity.  *Owen v. City of Independence*, 445 U.S. 622, 655-56 (1980).

25

We turn then to the issue of whether the County may be vicariously liable for damages caused by its employee under New York state law, even though that employee is entitled to individual immunity.

## B.    *Respondeat Superior*

The district court held that claims against a municipal employer must be dismissed when its employee is entitled to qualified immunity, regardless of whether that employee violated the law.  We agree, as does Triolo, that a municipal employer cannot be vicariously liable in the absence of unlawful conduct.  Here, however, Lee engaged in unlawful conduct when he arrested Triolo without probable cause.  Thus, the question is whether a municipal employer can be held vicariously liable for its individually immune employee under New York state law when that employee has been found liable for an underlying wrong.  It can.

New York law is clear that municipalities can be liable for the actions of police officers on false arrest claims under a theory of *respondeat superior*.  *See, e.g.*, *Jones v. State of New York*, 33 N.Y.2d 275, 279-80 (1973) ("A long line of cases has held the State or municipalities liable for the actions of their police officers in the line of duty.") (collecting cases).  Indeed, this Court has so

26

held.  *See, e.g., Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012)

(holding that an officer's liability for a false arrest claim under New York law

creates liability for the city "under a theory of *respondeat superior*"); *see also*

*Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010) ("The

remaining state law claim of assault and battery against the City of White Plains

is alive due to the potential for vicarious liability for actions of its police officers

as its employees.").

The next question is whether New York law categorically bars a

principal's vicarious liability when an agent is individually immune.  It does not.

New York courts have addressed this question in the context of spousal and

other immunities.  *See Schubert v. August Schubert Wagon Co.*, 249 N.Y. 253, 255

(1928) ("The disability of wife or husband to maintain an action against the other

for injuries to the person [given interspousal immunity] is not a disability to

maintain a like action against the other's principal or master."); *see also Rauch v.*

*Jones*, 4 N.Y.2d 592, 596 (1958) ("[T]he negligence of the employee having been

established, liability [for the employer] ensued under the rule of *respondeat*

*superior*.  The employer, of course, could not avail itself of the personal immunity

of the [employee].").  And although these cases are plainly distinguishable in that

27

they did not involve municipal liability, they do support the conclusion that an

agent's immunity is not a categorical bar to the principal's vicarious liability.

Basic agency principles outlined in the Restatement (Second) of

Agency (the "Restatement") provide similar guidance. *See* Restatement (Second)

of Agency § 217. Section 217 of the Restatement states that an employer remains

liable for its employee's wrongful conduct even when that employee is entitled to

personal immunity from paying damages. *Id.* Moreover, comment b to § 217

explains that where "the agent acts in the scope of employment, the fact that the

agent has an immunity from liability does not bar a civil action against the

principal . . . . This result is in accordance with the rule stated in this Section and

is the rule adopted in most of the states." *Id.* New York courts have relied on the

Restatement, including section 217. *See, e.g.*, *Padlo v. Spoor*, 422 N.Y.S.2d 895, 895

(4th Dep't 1979) (citing § 217(b)(ii)) [9]; *Winnick v. Kupperman Constr. Co.*, 287

N.Y.S.2d 329, 332 (2d Dep't 1968) (citing comment b to § 217).[10]

---

[9]     Section 217(b)(ii) of the Restatement provides that "[t]he principal has no defense
because of the fact that . . . the agent had an immunity from civil liability as to the act."
Contrary to the concurrence's contention, we do not look to the Restatement "alone [to]
settle[ ] an open question of New York law." Concurrence at 4. Rather, we look to the
Restatement for guidance, and consider it together with the other principles of law set
forth in the case law.

[10]     *See also Guardian Life Ins. Co. of Am. v. Chem. Bank*, 94 N.Y.2d 418, 422-43 (2000)
(citing Restatement (Second) of Agency § 3 for the proposition that a broker who is not

Lee was acting within the scope of employment when he arrested
Triolo.  Defendants do not directly respond to Triolo's argument that the County,
just like any other principal-employer, has *respondeat superior* liability for its
agent-employee's wrongdoing, even when that agent is entitled to personal
immunity from damages.  We see no reason why those basic agency principles
would not apply here.

Undeniably, this analysis can become muddled when it incorporates
caselaw involving no underlying violation.  For example, in dismissing the
claims against the County, the district court relied on a series of cases that did
not involve an underlying wrong.  In *Boyler v. City of Lackawanna*, 287 F. Supp. 3d

---

a general agent of an insurance company may still be a special agent for the purpose of
processing requests for policy loans and dividend withdrawals," and comment b to § 26
for the proposition that "a principal and agent need not enter into a formal contract in
order to create an agency relationship"); *Sokoloff v. Harriman Ests. Dev. Corp.*, 96 N.Y.2d
409, 416 (2001) (citing §§ 377, 403); *Parlato v. Equitable Life Assur. Soc. of U.S.*, 749
N.Y.S.2d 216, 220–21 (1st Dep't 2002) (citing §§ 261, 262, and 265 for the proposition that
"a principal may be held liable in tort for the misuse by its agent of his apparent
authority to defraud a third party who reasonably relies on the appearance of authority,
even if the agent commits the fraud solely for his personal benefit, and to the detriment
of the principal"); *G.K. Alan Assoc., Inc. v. Lazzari*, 840 N.Y.S. 2d 378, X (2d Dep't 2007)
(citing §§ 1, 376, 416, 456, 469); *Smalls v. Reliable Auto Serv., Inc.*, 612 N.Y.S.2d 674, 676
(2d Dep't 1994) (citing § 272 for the proposition that "[a] principal is bound by notice to
or knowledge of his or her agent in all matters within the scope of the agency,
notwithstanding the fact that such information is never actually communicated to the
principal"); *Nelson v. Times Square Stores Corp.*, 487 N.Y.S. 2d 814, 816 (2d Dep't 1985)
(Titone, J., concurring) (citing § 217).

308, 326 (W.D.N.Y. 2018), the court dismissed claims against officers and thus

against the city as well because the "arrest was supported by probable cause." In

*Brown v. City of New York*, the court held that there were "no unconstitutional

actions by the City's employees." 2015 WL 427942, at *6 (E.D.N.Y. Feb. 2, 2015)

(citing *Shapiro v. Kronfeld*, 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004)

(holding "there can be no imposition of vicarious liability in the absence of

underlying liability")). In *Hargroves v. City of New York*, 2014 WL 1271024, at *4

(E.D.N.Y. Mar. 26, 2014), the court dismissed vicarious liability claims against the

city because it found the officers acted objectively reasonably and thus there was

"no underlying offense for which the City could be held vicariously liable."

Lastly, in *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 161-62, 169 (E.D.N.Y. 2016), the

court held that "[t]he undisputed facts establish that probable cause existed to

arrest Plaintiff," and "[h]aving concluded that the Individual Defendants are

entitled to judgment as a matter of law with respect to Plaintiff's claims arising

under New York law, the County Defendants are also entitled to judgment as a

matter of law with respect to Plaintiff's claims for vicarious liability." Defendants

similarly rely on cases that are distinguishable in that, unlike here, they do not

involve underlying wrongful conduct.  Of course, when there is no underlying

liability, there can be no vicarious liability.

In *Kass v. City of New York*, 864 F.3d 200 (2d Cir. 2017), we upheld the

"dismiss[al of] Kass's state law false arrest claim against the City" because it was

"based solely on his allegation that the City is responsible for any false arrest that

was committed by the officers."  *Id.* at 213-14.  There, unlike here, we did not

conclude that the arresting officer lacked probable cause.  Indeed, in support of

our holding in *Kass*, we cited *Demoret v. Zegarelli*, 451 F.3d 140, 152-53 (2d Cir.

2006), where we held that the defendants were entitled to qualified immunity

because the plaintiffs had not established an underlying violation of their equal

protection rights.  Then, when discussing the vicarious liability of the

municipality, we stated:

> Plaintiffs' allegations that the [municipality] is liable for a
> hostile work environment are based solely on the acts of [the
> individual defendants].  Plaintiffs' claims against the
> [municipality] are thus inextricably intertwined with their
> claims against the individual defendants.  Because we have
> found as a matter of law that [the individual defendants] did
> not subject plaintiffs to a hostile work environment,
> defendants are entitled to summary judgment on plaintiffs'
> parallel state law causes of action.

31

*Demoret*, 451 F.3d at 153. In other words, because there was no underlying

violation, there was no vicarious liability. Here, in contrast, a jury found that Lee

lacked probable cause and therefore falsely arrested Triolo. Defendants cite no

persuasive authority as to why the County, as Lee's employer, cannot be

vicariously liable for the damages he caused in doing so.

        In sum, the County remains vicariously liable under New York law

for the compensatory damages because (1) municipalities are not entitled to

qualified immunity, (2) municipal employers may be vicariously liable on state

law claims brought against their police officer employees, (3) a principal remains

liable for damages caused by its agent, even when that agent is individually

immune, and (4) Lee was acting within the scope of his employment when he

arrested Triolo. Thus, even though Lee is shielded from personally paying for

the damages he caused by falsely arresting Triolo, the County remains liable for

those damages under New York state law.[11]

---

[11]     We understand our concurring colleague's reasons for preferring to certify this case to the New York Court of Appeals. But the case is almost six years old, and we disagree that "state law is so uncertain that we can make no reasonable prediction" on this issue. Concurrence at 3 (quoting *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005)). Needless to say, based on the principles and authorities discussed above, we are confident that our resolution of this case is "correct" and "makes good policy sense." *Id*. at 1.

*CONCLUSION*

For the reasons set forth above, we AFFIRM the district court's dismissal of the claims against Lee and REVERSE the district court's dismissal of the claims against the County, and REMAND for the entry of judgment in Triolo's favor against the County in the amount of $150,000 and for such other proceedings as may be appropriate.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

33

1    LOHIER, *Circuit Judge*, concurring:

2        The central question in this appeal is whether a county, town, or city in

3    New York State can be held liable under New York law for damages caused by

4    its own officials, even when the officials themselves are entitled to individual

5    immunity.  While the question is straightforward, the answer is not.

6    Nevertheless, the majority confidently holds that under New York law, the

7    immunity enjoyed by the police officers here does not relieve the County of its

8    vicarious municipal liability.  As is evident from the fact that I concur, I think

9    that answer may well be correct and certainly makes good policy sense.  But the

10   majority reaches the answer only by piecing together a tiny smattering of judicial

11   and non-judicial signals, recognizing, as we must, that New York courts have

12   thus far been silent on the issue.

13       Basic notions of federalism and deference to our state counterparts on

14   matters uniquely within the province of state law compels us to act cautiously

15   when wading into uncertain terrain of state law, so it would have been better, in

16   my view, to certify to the New York Court of Appeals the difficult question in

17   this case and ask for its guidance on the matter.  *See Penguin Grp. (USA) Inc. v.*

18   *Am. Buddha*, 609 F.3d 30, 41–43 (2d Cir. 2010).  But the majority today has

19   obviously opted not to do so.  I write separately to explain why this is probably a

1   mistake and why certification would have been preferable.  I also write to make

2   clear, however, that the decision to certify (or not to certify) is an institutional

3   one that represents our circuit's only formal avenue to converse with our New

4   York state court counterparts.

5                                        I

6          We have long recognized that certification of questions of state law is "a

7   valuable device for securing prompt and authoritative resolution of unsettled

8   questions, . . . especially those that seem likely to recur and to have significance

9   beyond the interests of the parties in a particular lawsuit." *Kidney v. Kolmar*

10  *Lab'y, Inc.*, 808 F.2d 955, 957 (2d Cir. 1987).  The Supreme Court itself has

11  explained that certification can "save time, energy, and resources and helps build

12  a cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391

13  (1974); *see also Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1157 & n.4

14  (2017) (Sotomayor, J., concurring) (recognizing the significance of a cooperative

15  judicial federalism and discussing the benefits that certification has brought to

16  our circuit).  And our state court colleagues, including former Chief Judge Judith

17  Kaye of the New York Court of Appeals, have also heralded the benefits of

18  certification.  *See* 70 N.Y.U. Annual Survey Am. L. 33, 33–34 (2014) (Chief Judge

2

1    Kaye observing that "[t]he certification process, as it has been actively and

2    vigorously employed by the Second Circuit, has done an enormous amount to

3    bridge the gap between our state and federal court systems. I cannot remember a

4    time in my own long career at the New York Bar that we have enjoyed such

5    camaraderie, collegiality, and mutual respect.")

6         In deciding whether or not to certify a question, we ask ourselves at least

7    three questions.  First, has the New York Court of Appeals squarely addressed

8    the issue, and, if not, do other decisions of intermediate appellate courts give us

9    sufficient guidance to predict with confidence how the Court of Appeals would

10   resolve it?  *See 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d

11   112, 125–26 (2d Cir. 2011); *see also DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir.

12   2005) (noting that certification is proper when "state law is so uncertain that we

13   can make no reasonable prediction" about how the state's highest court would

14   decide the question).  Second, is the question before us of "importance . . . to the

15   state" and does its resolution "require value judgments and important public

16   policy choices that the New York Court of Appeals is better situated than we to

17   make"?  *10 Ellicott Square Ct. Corp.,* 634 F.3d at 126 (citing *Am. Buddha*, 609 F.3d at

18   42).  And third, is the question "determinative of a claim before us"?  *Id.*

3

1    (quotation marks omitted).  The answer to each of those questions favors

2    certification here.

3          As the majority appears to acknowledge, not a single New York court has

4    addressed whether, under New York law, a municipality derives immunity from

5    the qualified immunity of its officers and employees.  *See* Majority Op. at 27–28.

6    Confronted with such a blank judicial slate, the majority turns instead to the

7    Restatement (Second) of Agency (the "Restatement") to fill the gap.  Although

8    the Restatement is an invaluable and unparalleled legal resource and guide for

9    federal and state courts, we have never before held that it alone settles an open

10   question of New York law, without the benefit of state court decisions, and the

11   majority does not suggest that the Court of Appeals has ever held itself bound by

12   the Restatement in its entirety.  In any event, the Restatement does not directly

13   answer the question of municipality liability and immunity that we consider.

14         The lack of compelling authority in this case should have prompted us to

15   certify the question of municipal liability rather than speculate about how the

16   Court of Appeals might answer the question.  Our hastiness to answer it as a

17   matter of first impression might be forgiven if the issue were a straightforward

18   application of blackletter law.  That is pretty obviously not the case.  The issue is

4

1    one of genuine importance, about which reasonable jurists might disagree; policy

2    considerations favor both sides; it requires us to make certain value judgments

3    and public policy choices on behalf of New York; and resolution of the issue will

4    have significant repercussions on the careful balancing between fiscal

5    considerations and accountability for the harms caused by police officers and

6    other officials in New York.  It is not clear, and I do not presume to know, how

7    the Court of Appeals might weigh those considerations[1] or how it might regard

8    any number of public policy reasons for distinguishing municipalities from

9    private employers, who clearly would be liable.  *See, e.g.*, *Rauch v. Jones*, 4 N.Y.2d

10   592, 596 (1958).  What is clear, though, is that *we* are not best positioned to decide

11   what the answer to the question should be.  As our colleague Judge Wesley, who

12   formerly sat on the Court of Appeals, has put it, that court, not the Second

13   Circuit, "is the umpire better suited to make this call."  *Tantaros v. Fox News*

14   *Network, LLC*, 12 F.4th 135, 150 (2d Cir. 2021) (Wesley, J., dissenting).

---

[1] The third factor clearly weighs in favor of certification.  Whether the County can be held vicariously liable under New York law is obviously dispositive of the question before us.  If the New York Court of Appeals agrees with us, Triolo will prevail.  If it disagrees, the County will be entirely immune from liability.

5

1                                    II

2          All of the above counsels a more restrained approach than the majority

3    adopts today.  But I recognize that my colleagues in the majority have decided

4    that they have enough to confidently answer the question that I would certify.  I

5    recognize, too, that certification in New York is (and was intended to be) an

6    *institutional* process, not a decision that is subject to the whims or preferences of

7    any individual judge.  Although I might have preferred to certify, there is no

8    institutional reason for me to dissent on that ground alone.  Dissenting gets our

9    Court nowhere, while concurring at least serves to mark our decision as one of

10   interest for the New York Court of Appeals.  Granted, this would have been a

11   more difficult approach to take if I thought the result that the majority reaches

12   was completely wrong.  But forced to answer the question, I am persuaded by

13   the majority's reasoning as to what New York law might require.  Municipal

14   immunity has been, in my view, rightly criticized on the ground that "the torts of

15   public employees are properly to be regarded, as in other cases of vicarious

16   liability, as a cost of the administration of government and should be borne by

17   the public."  Restatement (Second) of Torts § 895C cmt. D (1979).  I have less

1    confidence than the majority does, however, that the New York Court of Appeals

2    would agree.

3                                    *              *              *

4          For these reasons I concur.